**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| JOSEPH VAN SACH, | |
| Plaintiff, | |
| v. | Case No. _____ |
| UNITED STATES OF AMERICA. | Hon. _____ |
| Defendant. | |

## COMPLAINT

Plaintiff Joseph Van Sach, by and through his attorneys, Perkins Coie LLP and Dvorak Law Offices, LLC, respectfully submits this Complaint and, in support thereof, states as follows:

### Introduction

1.      This is a civil action against the United States of America for damages brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-2680, ("FTCA") arising out of extensive physical and resulting emotional injuries deliberately inflicted upon federal offender Joseph Van Sach while in the custody of the United States at United States Penitentiary Thomson ("USP Thomson") over the course of two days by certain Federal Bureau of Prisons ("BOP") corrections officers.

### Jurisdiction and Venue

2.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and the FTCA, 28 U.S.C. §§ 1346(b) and 2671-2680.

3.      This Court has jurisdiction over the Defendant United States of America ("United States") because each cause of action alleged arises out of tortious acts and omissions committed

by various BOP employees acting within the scope of their employment while working at USP Thomson, located in the City of Thomson, Carroll County, Illinois.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this lawsuit occurred at USP Thomson, located in the City of Thomson, Carroll County, Illinois, which is within this judicial district.

## The Parties

5.      Plaintiff Joseph Van Sach ("Van Sach") is and was at the time of the incidents described below, an offender in the custody of the United States at USP Thomson (BOP Inmate Register No. 17041-424).

6.      At all relevant times, the United States owned, operated, and/or controlled operations at USP Thomson through the BOP.  Defendant is named pursuant to the FTCA.

## Factual Allegations Applicable to All Counts

### BOP Officers Use Excessive Force Against Van Sach

7.      Van Sach has been an inmate at USP Thomson since February 2019.

8.      Van Sach suffers from several medical conditions, including having his left index toe amputated and having psoriatic arthritis in his left ankle.

9.      Prior to the events described below, USP Thomson staff posted a notice on or near the door to his cell in Echo-1 Unit informing passersby and prison staff that:

> a.   Van Sach had his left index toe amputated;
>
> b.   Van Sach suffers from psoriatic arthritis in his left ankle; and
>
> c.   Van Sach's arthritis and missing toe create balance and stability problems.

10.     During the morning of April 2, 2019, Van Sach got into a dispute with several USP Thomson correctional officers. As a result of the dispute, such officers placed him in soft-ambulatory restraints and moved him to another cell in Echo-1 Unit.

11.     The soft-ambulatory restraints restrained Van Sach's legs and hands, and were connected together with a waist chain known as a "Martin chain."

12.     Van Sach remained restrained and in the other cell for approximately the next seven hours without incident.

13.     BOP regulations authorize the use of force by a corrections officer against an inmate "only as a last alternative after all other reasonable efforts to resolve a situation have failed." *See* 28 C.F.R. § 552.20.

14.     Even then, a corrections officer's ability to use force against an inmate is limited solely to the following situations: to (a) "gain control of the inmate," (b) "protect and ensure the safety of inmates, staff and others," (c) "prevent serious property damage," or (d) "ensure institution security and good order." *See id.*

15.     The same regulations specifically prohibit corrections officers from using force to "punish an inmate." *See* 28 C.F.R. § 552.22(b).

16.     On information and belief, at approximately 6:20 p.m. on April 2, 2019, Corrections Officers Kyle Maybury ("CO Maybury") and Brandon Mullins ("CO Mullins") came to Van Sach's cell. They were accompanied by a more senior officer, Lieutenant Dennis Murton ("Lieutenant Murton").

17.     Upon entering, CO Maybury and CO Mullins moved further into the cell and instructed Van Sach to move to the middle of the cell, while Lieutenant Murton remained by the entrance to the cell and faced outwards, towards the door.

18. Van Sach moved as instructed, with CO Mullins standing behind him on his left side holding the Martin chain connected to the restraints.

19. CO Maybury, who stood in front of Van Sach, then instructed Van Sach to raise his hands and permit CO Maybury to tighten the restraints. Van Sach complied with CO Maybury's instruction, allowing him to insert a key into one of the restraints.

20. CO Mullins – who was still holding the Martin chain connected to Van Sach's restraints – then asked whether Van Sach thought CO Mullins and CO Maybury were "soft," to which Van Sach replied "yes."

21. CO Maybury suddenly released the restraint holding Van Sach's left wrist, causing his hand to become free.

22. An altercation then ensued during which CO Mullins struck Van Sach with a closed-fisted, "windmill" punch on or around Van Sach's left eye. CO Maybury then punched Van Sach with a closed fist several times near Van Sach's mouth.

23. As a result, Van Sach stumbled backwards toward the toilet in the cell. He then raised his free left hand to protect himself and show that he was submitting to CO Maybury's and CO Mullins' displays of force.

24. CO Maybury and CO Mullins disregarded Van Sach's raised hand and failed to deescalate the situation. Instead, they viciously beat Van Sach's face and head with closed fists, landing at least eight blows.

25. Van Sach – who was in substantial pain – fell to the floor in his restraints and pushed himself under one of the beds in the cell for protection.

26. Lieutenant Murton, who was in a supervisory position over CO Mullins and CO Maybury, had a reasonable opportunity to prevent the unnecessary use of force before it occurred

and during its commission, but instead turned a blind eye toward his subordinates' tortious misconduct and failed to intervene until after Van Sach was under the bed.

27.     CO Mullins and CO Maybury also had a reasonable opportunity to prevent each other from unnecessarily harming Van Sach, but each failed to do so.

28.     Following this incident, Corrections Officers G. Arroyo (first name unknown) ("CO Arroyo") and A. Shaffer (first name unknown) ("CO Shaffer") entered the cell while Van Sach was still under the bed.

29.     Van Sach informed CO Arroyo and CO Shaffer that his left hand was free before leaving the shelter provided by the bed. Van Sach then slowly stood up and allowed CO Arroyo to put his left hand back into the soft-ambulatory restraints without dispute.

30.     During the encounter described above, Van Sach's legs and right arm were restrained. Moreover, after Van Sach submitted to CO Mullins' and Maybury's show of force, he was not a threat to any of the BOP law enforcement officials present; to any other inmates, staff, or prison property; or to the security or good order of the prison. The BOP law enforcement officials' tortious use of force after his submission was, therefore, intentional, punitive, excessive, and legally unjustifiable.

31.     As a result of this attack, Van Sach sustained a severe headache, a black eye, a lump on his head, and bruises and cuts to his ankles and wrists.

### BOP Law Enforcement Officers Unlawfully Hold Van Sach Overnight in Tight, Unnecessary Four-Point Restraints; Deny Him Opportunities to Use the Toilet; and Brutally Beat Him[1]

32.     Federal regulation authorizes the use of restraints only when "necessary to gain control of a prisoner who appears to be dangerous because the prisoner: (a) assaults another

---

[1] On information and belief, the practices described below are routinely used at USP Thomson to retaliate against inmates and punish them. This routine practice has been the subject of numerous internal grievances and lawsuits in

individual, (b) destroys government property, (c) attempts suicide, (d) inflicts injury upon self, or (e) becomes violent or displays signs of imminent violence." *See* 28 C.F.R. § 552.20.

33.     Federal regulation also specifically prohibits the application of *any* restraints: (a) as "a method of punishing an inmate," (b) "in any manner which restricts blood circulation," or (c) "[i]n a manner that causes unnecessary physical pain or extreme discomfort." *See* 28 C.F.R. § 552.22(h).

34.     The use of four-point restraints is heavily regulated and, under proper conditions, rarely employed. Indeed, federal regulation prohibits the use of four-point restraints by BOP employees unless, *inter alia*: (a) soft-ambulatory restraints were previously ineffective in restraining an inmate, (b) the inmate is placed on a bed with a mattress in clothing appropriate to the temperature, (c) the inmate is provided with a sheet or blanket, ***and*** (d) the inmate is allowed to use the toilet every two hours. *See* 28 C.F.R. § 552.24.

35.     As with all restraints, four-point restraints also cannot be used as a means of punishment. *See* 28 C.F.R. § 552.22(h)(1).

36.     At approximately 6:40 p.m. on April 2, 2019, Lieutenant Murton, assisted by five other Corrections Officers, rolled Van Sach from Echo-1 Unit to the Health Services Building on a gurney, placed him in observation cell A1-14, and secured him in four-point restraints.

37.     USP Thompson Nurse M. Bergmann (first name unknown) ("Nurse Bergmann") then conducted a cursory medical examination and restraint check. Van Sach alerted the BOP law enforcement officials present and Nurse Bergmann to the facts that (a) his four-point restraints were too tight, (b) his head was ringing, and (c) his left eye was throbbing. He requested that his

---

this Court. Van Sach has filed an action pending in this Court against certain BOP officials described herein in their individual capacities seeking relief under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See Van Sach v. H. Boussag, et al.*, Case No. 3:20-cv-50180 (N.D. Ill.).

restraints be loosened and to use the toilet. All personnel present, including Lieutenant Murton, ignored Van Sach's requests and left the observation cell.

38.     BOP law enforcement officials and medical personnel conducted many more restraint checks over the course of the next twenty hours. During each encounter, Van Sach pleaded to have the four-point restraints loosened, to use the toilet, and (when applicable) to be provided fresh clothes. But instead of coming to his aid, those BOP officials ignored or denied *every* such request.

39.     Moreover, during that time (as is described below in detail):

   a.  Van Sach was physically attacked by multiple BOP law enforcement officials during two restraint checks;

   b.  Van Sach remained in substantial pain and unable to sleep as his overly tight restraints were either tightened or not loosened, despite his repeated requests that they be loosened;

   c.  Van Sach was not given clothing appropriate to the temperature – he was only provided with paper medical garments and a paper sheet; and

   d.  Van Sach was not given the opportunity to use the toilet every two hours. Far from it. Van Sach's repeated requests to use the toilet were *always* denied or ignored, forcing him to urinate upon and soil himself and his paper sheets and garments multiple times.

40.     At approximately 7:15 p.m. on April 2, 2019, Lieutenant Murton returned to the observation cell, accompanied by Nurse Bergmann, CO Maybury, CO Mullins, and five other BOP law enforcement officers, including CO Shaffer.

41.     Van Sach alerted those present to the facts that (a) the four-point restraints were too tight, (b) his head was ringing, and (c) his left eye was throbbing. He requested medical treatment, that his restraints be loosened, and to use the toilet.

42.     Lieutenant Murton instructed Van Sach not to talk to Nurse Bergmann. Nurse Bergmann then falsely concluded that the four-point restraints were correctly applied and did not

offer any medical treatment. And none of the BOP personnel present loosened Van Sach's restraints or permitted him to use the toilet before leaving the observation cell, despite federal regulations requiring otherwise.

43.     On information and belief, CO Shaffer recorded a video of Van Sach secured to the bed in four-point restraints during the approximately 7:15 p.m. encounter.

44.     On information and belief, Lieutenant Murton took a photograph during the approximately 7:15 p.m. encounter demonstrating that Van Sach's hands were already discolored from lack of circulation caused by the four-point restraints.

45.     At approximately 8:40 p.m. on April 2, 2019, Nurse Vanessa Garcia ("Nurse Garcia"), Lieutenant McDowell (first name or initial unknown) and several unidentified corrections officers entered Van Sach's observation cell to conduct another restraint check.

46.     As he had with Nurse Bergmann, Van Sach alerted Nurse Garcia to each of the injuries described above and asked for medical treatment. He also requested that the BOP personnel present loosen his restraints and asked to use the toilet.

47.     Nurse Garcia then falsely concluded that the four-point restraints were correctly applied but did not offer any medical treatment. And none of the BOP personnel present loosened Van Sach's restraints or permitted him to use the toilet despite federal regulations requiring otherwise.

48.     At some point after the approximately 8:40 p.m. encounter, Van Sach urinated on himself because he was not permitted to use the toilet.

49.     At approximately 10:40 p.m. on April 2, 2019, Nurse Garcia, Lieutenant McDowell (first name unknown), and several unidentified corrections officers entered Van Sach's observation cell to conduct another restraint check.

50.     As he had two hours before, Van Sach alerted Nurse Garcia to each of the injuries described above and asked for medical treatment. Van Sach also requested that the BOP personnel present loosen his restraints, allow him to use the toilet, and change his soiled clothes and sheets.

51.     In response, Lieutenant McDowell told him not to speak to Nurse Garcia and said that Van Sach just "had to suffer through" any pain caused by the tightness of the restraints.

52.     Nurse Garcia falsely concluded that the four-point restraints were correctly applied but did not offer any medical treatment. And none of the BOP personnel present loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet despite federal regulations requiring otherwise.

53.     At approximately 12:15 a.m. on April 3, 2019, Nurse Bergmann, Lieutenant B. McCoic (first name unknown) ("Lieutenant McCoic"), and other unidentified BOP corrections officers, entered Van Sach's observation cell to conduct another restraint check.

54.     Again, Van Sach alerted Nurse Bergmann to each of the injuries described above and asked for medical treatment, this time noting that the vision in his left eye was becoming blurry. Van Sach also requested that the BOP personnel present loosen his restraints, allow him to use the toilet, and change his soiled clothes and sheets.

55.     Nurse Bergmann again falsely concluded that Van Sach's four-point restraints were safely applied but did not offer any medical treatment. And none of the BOP personnel present loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet despite federal regulations requiring otherwise.

56.     On information and belief, at approximately 2:15 a.m. on April 3, 2019 and, again, at approximately 4:15 a.m. on April 3, 2019, Nurse Bergmann, accompanied by Lieutenant McCoic, conducted additional restraint checks. During both encounters, Van Sach again alerted

Nurse Bergmann to his injuries and asked for medical treatment. He also requested that the BOP personnel present loosen his restraints, allow him to use the toilet, and change his soiled clothes and sheets.

57.     During both encounters, Nurse Bergmann again falsely concluded that Van Sach's four-point restraints were safely applied but did not offer any medical treatment. And neither she nor McCoic loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet despite federal regulations requiring otherwise.

58.     At some point after the approximately 4:15 a.m. encounter, Van Sach urinated on himself again because he had not been allowed to use the toilet for more than nine hours while in four-point restraints. At the time, Van Sach was wearing the same soiled paper garments he had been wearing throughout, which had not been changed despite his requests after he initially urinated on himself several hours earlier.

59.     At approximately 6:30 a.m. on April 3, 2019, Nurse Kristen Bice ("Nurse Bice") conducted a restraint check, accompanied by Lieutenant D. Behle (first name unknown) ("Lieutenant Behle"). As he did with Nurses Bergmann and Garcia, Van Sach alerted Nurse Bice to each of the injuries described above and asked for medical treatment. He also requested that the BOP personnel present loosen his restraints, allow him to use the toilet, and change his soiled clothes and sheets. Nurse Bice verbally noted that Van Sach had a "black eye," a "lump on [his] head," and "some marks on" him. But she did not offer Van Sach any medical treatment. And neither she nor Lieutenant Behle loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet despite federal regulations requiring otherwise.

60.     At approximately 7:30 a.m. on April 3, 2019, Van Sach urinated on himself for a third time because he had not been allowed to use the toilet for more than 12 hours while in four-point restraints.

61.     On information and belief, Nurse Kloepping (first name unknown) ("Nurse Kloepping"), Lieutenant Randall Erskine ("Lieutenant Erskine"), Corrections Officer Micheal Young ("CO Young") and Corrections Officer R. Kaufman (first name unknown) ("CO Kaufman"), entered the observation cell at approximately 8:15 a.m. on April 3, 2019, to conduct a restraint check and administer Van Sach's previously prescribed medication.

62.     As he had with Nurses Bergmann, Garcia, and Bice, Van Sach alerted Nurse Kloepping to each of the injuries described above and asked for medical treatment. He also requested that the BOP personnel present loosen his restraints, allow him to use the toilet, and change his soiled clothes and sheets.

63.     Lieutenant Erskine brought a receptacle for Van Sach to urinate in but did not offer it to Van Sach, instead leaving it outside the cell. He stated that Van Sach did not need it because he had already urinated on his paper garments and paper sheet.

64.     Nurse Kloepping administered Van Sach's medication but did not otherwise offer any medical treatment or note this encounter in his medical records. And neither she, Lieutenant Erskine, CO Young, nor CO R. Kaufman loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet despite federal regulations requiring otherwise.

65.     And foreshadowing what was to come, Lieutenant Erskine deliberately squirted Van Sach in the face with water from a bottle that he was supposed to use to assist Van Sach in

swallowing his medication. Indeed, Lieutenant Erskine asked Nurse Kloepping during the encounter whether he could keep the bottle to use as a weapon against other inmates.

66.     At some point soon after the approximately 8:15 a.m. encounter, an unknown BOP official finally changed Van Sach's soiled paper medical garment and sheets, but not the soiled mat under him.

67.     At no point from approximately 7:15 p.m. on April 2, 2019, through 8:15 a.m. on April 3, 2019, did Van Sach assault anyone, destroy government property, attempt suicide, inflict any injury upon himself, become violent, or display signs of imminent violence. During this entire time, Van Sach was also held in unnecessarily tight four-point restraints, which (a) caused Van Sach unnecessary physical pain and extreme discomfort, (b) forced him to remain in soiled clothes while lying under a soiled sheet, and (c) denied him access to a toilet. Moreover, Van Sach repeatedly asked the BOP Law Enforcement Officials to loosen those four-point restraints. The application of four-point restraints was, therefore, intentional, punitive, and unlawful.

### CO Boussag, CO Young, and Lieutenant Erskine Physically Assault a Restrained, Injured, and Defenseless Van Sach[2]

68.     For some of the BOP law enforcement officers, painfully and unlawfully restraining Van Sach, denying him the use of a toilet, and denying him medical care for his serious injuries for more than 15 hours was apparently not enough.

69.     On information and belief, at approximately 10:15 a.m. on April 3, 2019, Lieutenant Erskine, Corrections Officer Hamza Boussag ("CO Boussag"), and CO Young entered Van Sach's observation cell for what, on its face, appeared to be another periodic restraint check. This time, however, they did not come with medical personnel. Instead, Corrections Officer

---

[2] On information and belief, the practices described below are also routinely used at Thomson to retaliate against inmates and punish them. This routine practice has been the subject of numerous internal grievances and lawsuits in this Court.

-12-

McClain (first name unknown) ("CO McClain") and three unidentified BOP corrections officers dressed in riot gear accompanied them.[3]

70.     At Lieutenant Erskine's direction, CO Boussag and CO Young tightened the restraints holding Van Sach's arms, which at this point he had been wearing for more than 15 hours, causing him further pain.

71.     Also acting at Lieutenant Erskine's direction, the three unidentified officers stood at the foot of the bed and one of them tightened Van Sach's leg restraints.

72.     Van Sach had advised Lieutenant Erskine during two earlier encounters that his restraints were already too tight. Lieutenant Erskine nonetheless ordered his subordinates to intentionally cause Van Sach further pain.

73.     Van Sach also asked to use the toilet. Lieutenant Erskine denied this request, telling Van Sach that he would have to urinate on himself.

74.     As Van Sach laid in this bed, without proper clothing or other protection, in overly tight restraints that were just tightened again, unable to use the toilet, and still injured and in pain from the unprovoked assault on him the night before, CO Boussag and CO Young – at Lieutenant Erkine's direction – placed a long, plastic shield tightly on top of Van Sach's thighs, torso, and head.

75.     With CO Boussag and CO Young applying pressure to hold the shield down, Lieutenant Erskine – who was standing at the head of the bed – placed his hands on the plastic shield and began applying downward pressure, smashing it into Van Sach's head and body.

---

[3] On information and belief, CO McClain refused to participate in the incident described below.

76.     Apparently, physically pressing down on Van Sach was not enough for Lieutenant Erskine. So, he then leaped into the air and slammed his left knee into the portion of the shield directly over Van Sach's head, driving it into Van Sach's skull.

77.     This caused Van Sach – who was already suffering from head pain and trauma from the physical force applied to him by CO Maybury and CO Mullins the night before – to incur further severe head injury.

78.     Lieutenant Erskine repeated the act of driving his knee into the plastic shield atop Van Sach's head several times. As this happened, CO Boussag and CO Young continued to hold down the shield, doing nothing to stop Lieutenant Erskine or each other. The remaining officers who could all see this happening, did nothing to stop it either.

79.     As Lieutenant Erskine drove his knee into the plastic shield, he shouted at Van Sach that CO Mullins is his relative.

80.     After Lieutenant Erksine's barrage of blows to Van Sach's head came to an end, the officers removed the plastic shield from Van Sach's body and left the observation cell. Before leaving, they did not call for medical assistance, did not loosen the now-tighter four-point restraints, did not give Van Sach the opportunity to use the toilet, and did not offer or provide aid for Van Sach's existing injuries, all in violation of federal regulations.

81.     At some point after the approximately 10:15 a.m. encounter, Van Sach urinated on himself for a fourth time because he had not been allowed to use the toilet for almost sixteen hours.

82.     At approximately 12:15 p.m. on April 3, 2019, Lieutenant Erskine, CO Young, and CO Boussag returned to the observation cell, accompanied by three more unidentified BOP corrections officers dressed in riot gear.

83. Although the restraints remained tightened from the approximately 10:15 a.m. assault, Lieutenant Erskine once again instructed his subordinates to tighten Van Sach's four-point restraints even more.

84. In response, CO Boussag took Van Sach's left hand out of the restraint, twisted it so that his palm was almost facing the bed, and locked his hand and wrist tightly back in the restraint, laughing as he did so.

85. Almost immediately, Van Sach's left hand began to swell and change color.

86. As Van Sach's left hand went from red to purple to white, Lieutenant Erskine exclaimed: "Oh shit, take his hand out of the cuff!"

87. CO Boussag did as Lieutenant Erskine instructed and placed Van Sach's left hand back in the restraint with his palm facing upwards. CO Boussag then tightened the restraint significantly. As this happened, CO Young and two other officers tightened the restraints on Van Sach's remaining limbs.

88. With Van Sach now even more-painfully restrained, CO Boussag and CO Young, as before, pulled out a long plastic shield and secured it over Van Sach's head and body by placing downward pressure on him.

89. Lieutenant Erskine – who was again standing at the head of the bed – pressed one hand against the plastic shield, causing it to smash Van Sach's head.

90. Lieutenant Erskine then, as before, leaped into the air and slammed his left knee into the portion of the shield directly over Van Sach's head. This caused Van Sach to incur further severe head injury.

91. Lieutenant Erskine repeated the act of driving his knee into the plastic shield atop Van Sach's head several times. As this happened, CO Boussag and CO Young continued to hold

down the shield, doing nothing to stop Lieutenant Erskine or each other. The remaining officers, who could all see this happening, did nothing to stop it either.

92.     After Lieutenant Erksine's barrage of blows to Van Sach's head came to an end, the officers removed the plastic shield from Van Sach's body and left the observation cell. Before leaving, they did not call for medical assistance, did not loosen the now-tighter four-point restraints, did not give Van Sach the opportunity to use the toilet, did not request that Van Sach's soiled garments and sheet be changed, and did not offer or provide aid for Van Sach's existing injuries, all in violation of federal regulations.

93.     During both the approximately 10:15 a.m. and approximately 12:15 p.m. encounters on April 3, 2019, Van Sach posed no threat to Lieutenant Erskine, CO Boussag, CO Young, or the other BOP employees present. Van Sach did not present a threat to his fellow inmates, BOP property, or to the security or good order of the prison either. The use of force by Lieutenant Erksine, CO Boussag, CO Young, and the aforementioned unidentified officers was, therefore, intentional, punitive, excessive, and unjustifiable. And for the reasons noted above, the continued application of four-point restraints was intentional, punitive, excessive, and unlawful as well.

### *CO Maybury Kicks Van Sach's Injured Foot While Escorting Him Back to Echo-1 Unit*

94.     At approximately 2:00 p.m. on April 3, 2019, Lieutenant Erskine, CO Maybury, CO Young, and multiple unidentified officials returned to the observation cell. Several of these officials were again wearing riot gear.

95.     After entering, the officers removed Van Sach from the four-point restraints, replaced his soiled paper medical garments with new paper medical garments, and placed him in hard-ambulatory restraints.

-16-

96.     One of the officers informed Van Sach that he would now be returned to a cell in Echo-1 Unit – a trip that would require Van Sach to walk outside for a distance of approximately two city blocks.

97.     Van Sach requested that the officers provide him with shoes and warmer clothing for the journey.

98.     According to the National Weather Service, the average temperature that day in nearby Mount Carroll, Illinois (the closest weather station to USP Thomson) was 36° F.[4] The high temperature for that day in Mount Carroll was 49° F.[5]

99.     The BOP Law Enforcement Officials present, however, refused to provide Van Sach with climate-appropriate clothes or shoes, even after Van Sach requested the same. Indeed, in response to Van Sach's request, Lieutenant Erskine exclaimed: "You get what you've got on. That's it, nothing more or less."

100.    The officers then escorted Van Sach back to Echo-1 Unit from the observation cell.

101.    Once outside, CO Maybury began walking behind Van Sach and kicked at Van Sach's bare left foot and ankle several times. At least one kick landed on Van Sach's left foot and caused him to stumble.

102.    At all times during the journey back to Echo-1 Unit, Van Sach wore hard-ambulatory restraints and, as such, posed no threat to Lieutenant Erskine, CO Maybury and CO Young, other BOP employees, fellow inmates, BOP property, or the security or good order of the prison.

103.    And as noted above, Van Sach's left index toe was previously amputated, and he suffers from psoriatic arthritis in his left ankle. Both of these conditions, individually and in

---

[4] Available at https://www.weather.gov/wrh/Climate?wfo=dvn.
[5] *Id.*

combination, create stability and balance problems for Van Sach. CO Maybury knew of these conditions when he repeatedly kicked at Van Sach's left foot and ankle because of the notice posted on Van Sach's cell door.

104.     CO Maybury's use of force was, therefore, intentional, punitive, excessive, and legally unjustifiable. And as CO Maybury's supervisor and colleagues, Lieutenant Erskine, CO Young, and the remaining officials present failed to intervene on Van Sach's behalf.

105.     This group of BOP Law Enforcement Officials escorted Van Sach back to his cell block but did not place him in his regular cell. He remained in an alternate cell, in hard-ambulatory restraints, for at least six more hours.

*Aftermath*

106.     As a result of the incidents described above, Van Sach sustained a black eye, a lump on his head, a severe headache that lasted for days, and scarring on his wrists and ankles from cuts that remained open wounds for approximately one month.

107.     Even after his physical wounds healed, Van Sach has continued to suffer from debilitating anxiety, which manifests as insomnia and trembling at the thought of encountering the BOP personnel identified above.

### Exhaustion of Administrative Remedies

108.     Van Sach has exhausted BOP's administrative-remedy request process with respect to each of the incidents described above.

109.     Van Sach, acting through his counsel, submitted requests for administrative relief to BOP pursuant to the FTCA ("FTCA Requests") dated March 29, 2021. BOP received the FTCA Requests on March 31, 2021 at 12:43 p.m. BOP was, therefore, required to respond to such requests on or before September 30, 2021.

110.    BOP failed to make a final disposition of Van Sach's FTCA Requests before September 30, 2021, which constitutes a constructive final denial of those requests under the FTCA.

111.    Based on the foregoing, this action is timely filed and Van Sach's claims are ripe for adjudication by this Court.

## Causes of Action

### Count I - FTCA - Civil Battery

112.    Plaintiff restates the allegations contained in the foregoing Paragraphs as if fully stated herein.

113.    The FTCA authorizes Plaintiffs injured by employees of the United States acting within the scope of their employment to maintain civil lawsuits against the United States seeking compensation for their injuries.

114.    At all relevant times and except as noted above, every BOP official identified herein was a federal law enforcement officer acting under color of federal law and within the scope of his or her employment.

115.    As is described above, at various times on April 2, 2019 and April 3, 2019, several BOP officials intentionally used harmful and/or offensive force against Van Sach without authorization or justification, and while he was restrained, including, without limitation, the following:

    a. CO Mullins and CO Maybury punching Van Sach while partially restrained, and *after* he fell to the ground and submitted to their show of force, during the evening of April 2, 2019;

    b. The BOP officials' unnecessary and unlawful application of four-point restraints on April 2, 2019, and April 3, 2019, including BOP officers' tightening of, and refusal to loosen or remove, those restraints after Van Sach informed them that the restraints were too tight;

    c.   Lieutenant Erskine spraying Van Sach with water while he was in four-point restraints during the morning of April 3, 2019;

    d.   CO Boussag and CO Young placing a plastic shield over Van Sach multiple times during the morning of April 3, 2019 and applying downward pressure on Van Sach while he was restrained;

    e.   Lieutenant Erskine leading multiple violent, unprovoked attacks on Van Sach while Van Sach was in four-point restraints in the observation cell during the morning on April 3, 2019, which included without limitation Lieutenant Erskine pressing down on the plastic shield he ordered placed on Van Sach and dropping his knee multiple times on the portion of the shield being held over Van Sach's defenseless head; and

    f.   CO Maybury kicking Van Sach's feet while Van Sach walked through the prison complex on April 3, 2019.

116.    As direct and proximate results of the conduct, described above, Van Sach unnecessarily suffered, and continues to suffer from, enduring physical and emotional injuries, causing him damages in an amount to be proven at trial but not to exceed the amount Van Sach requested in the FTCA requests.

### Count II - FTCA - Civil Assault

117.    Plaintiff restates the allegations contained in the foregoing Paragraphs as if fully stated herein.

118.    The FTCA authorizes Plaintiffs injured by employees of the United States acting within the scope of their employment to maintain civil lawsuits against the United States seeking compensation for their injuries.

119.    At all relevant times and except as noted above, every BOP official identified herein was a federal law enforcement officer acting under color of federal law and within the scope of his or her employment.

-20-

120.    As is described above, at various times on April 2, 2019 and April 3, 2019, several BOP officials intentionally and unlawfully threatened the use of corporeal force against Van Sach while he was restrained, including, without limitation, the following:

      a.    Lieutenant Erskine, CO Boussag and CO Young placing a plastic shield over Van Sach's body and head *before* physically attacking him, but while he was in four-point restraints on April 3, 2019; and

      b.    CO Maybury kicking at Van Sach's disabled foot and ankle while escorting him back to Echo-1 unit on April 3, 2019.

121.    The relevant BOP officials had the apparent present ability to effectuate the use of such corporeal force and Van Sach could not prevent such attempts because he was restrained at all times.

122.    Under such circumstances, the BOP employees' threats created a well-founded fear of imminent peril in Van Sach.

123.    As direct and proximate results of the conduct described above, Van Sach suffers from debilitating anxiety, which manifests itself as insomnia and trembling at the thought of encountering the relevant BOP officials, causing him damages in an amount to be proven at trial but not to exceed the amount Van Sach requested in his FTCA requests.

## **Prayer for Relief**

**WHEREFORE**, Plaintiff Joseph Van Sach respectfully requests that this Honorable Court grant him the following relief:

A.    Enter a judgment in favor of Van Sach and against Defendant, as requested herein, on each of the Counts in the Complaint;

B.    Award Van Sach his actual and consequential compensatory damages as a result of the BOP law enforcement officers' willful and wanton tortious conduct;

C.    Award Van Sach his reasonable attorneys' fees and costs pursuant to and as limited by applicable law;

D.     Award Van Sach pre-judgement and post-judgment interest pursuant to and as limited by applicable law; and

E.     Grant any other and further relief that the Court deems just and equitable.

Dated: March 30, 2022                              Respectfully submitted,

*/s/* C. Vincent Maloney
C. Vincent Maloney (ARDC No. 06196631)
Perkins Coie LLP
131 South Dearborn Street
Suite No. 1700
Chicago, Illinois 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400
CVMaloney@perkinscoie.com

Richard Dvorak (ARDC No. 6269687)
Dvorak Law Offices, LLC
900 West Jackson, Suite 7E
Chicago, IL 60607
Telephone: (630) 568-3190
Richard.Dvorak@civilrightsdefenders.com

***Counsel for Plaintiff,
Joseph Van Sach (BOP Inmate Register
No. 17041-424)***